**UNITED STATES BORAX & CHEMICAL CORPORATION, Appellee,**

v.

**ARCHER–DANIELS–MIDLAND COMPANY; ADM/Growmark River System, Inc. a/k/a ADM/Growmark a/k/a ADM Grain Company, Tabor Grain Co. a/k/a Tabor Grain & Co. a/k/a Tabor Grain, Appellants.**

No. 92–841.

Court of Appeals of Iowa.

June 29, 1993.

Craig D. Warner of Aspelmeier, Fisch, Power, Warner & Enberg, Burlington, for appellants.

Terry D. Loeschen and John M. Loeschen of Loeschen & Loeschen, Burlington, for appellee.

Heard by OXBERGER, C.J., and DONIELSON, J., and McCARTNEY, Senior Judge.*

DONIELSON, Judge.

On April 3, 1987, a fire and explosion occurring at an elevator owned by the Archer–Daniels–Midland Company (ADM) in Burlington, Iowa, damaged approximately 600 tons of plaintiff's product, boron or "Borax," in railroad cars near the elevator. The plaintiff (U.S. Borax) subsequently sold the damaged Borax for approximately $50,000. The railroad cars were moved in January 1989.

In September 1990, U.S. Borax filed a petition alleging the negligence of the defendant, ADM, was a proximate cause of the damage to its product, Borax. Trial to a jury commenced in March 1992.

At trial, U.S. Borax presented the testimony of John Mann, former counsel for U.S. Borax. Mann testified about the difficulties in negotiating with ADM's insurance adjuster. During his testimony, Mann referred to a settlement offer of $110,000. Twice, ADM moved for a mistrial on the basis of the admission of this testimony. The district court denied the motions. However, the court admonished the jury to disregard the testimony and ordered the testimony stricken from the record.

U.S. Borax also presented the testimony of its expert witness, Professor Boyd Hartley. Professor Hartley stated the lack of a fire alarm system or sprinkler system may have contributed to the fire and resulting explosion. He also testified there was an excessive level of dust at the elevator facility. Professor Hartley specifically referred to a study of the National Grain and Feed Association which identified a standard for a nonhazardous level of dust. ADM objected and argued any testimony which dealt with industry standards for an acceptable level of grain dust exceeded the scope of discovery. The court overruled the objection and allowed Professor Hartley to testify regarding the study.

Following the presentation of the evidence, ADM objected to Jury Instruction No. 18. Instruction No. 18 stated the measure of damages for the Borax included its fair and reasonable market value before damaged, less any salvage value. ADM argued the damages should be measured by the replacement cost of the Borax. The court submitted the instruction without any modification.

The jury subsequently returned a verdict for the plaintiff and awarded damages of $171,893.55. The damages included $64,-745.92 for the damaged Borax. ADM filed a motion for new trial and motion for judgment notwithstanding the verdict. In April 1992,

---

* Senior judge from the 2nd Judicial District serving on this court by order of the Iowa Supreme Court.

the district court denied the posttrial motions. ADM now appeals.

ADM contends there was insufficient evidence supporting U.S. Borax's claim of negligence. ADM argues the court erred in instructing the jury on the fair and reasonable market value of the Borax and in not instructing the jury on replacement cost. ADM also argues the district court erred in not ordering a mistrial following the admission of evidence regarding settlement negotiations. Finally, ADM contends the court erred in permitting Professor Hartley to testify beyond the scope of his testimony in discovery proceedings.

Our scope of review is for the correction of errors of law. Iowa R.App.P. 4.

■ **I.** *Sufficiency of the Evidence.* ADM first contends there was insufficient evidence to sustain the jury's verdict. We disagree.

■ In determining whether the district court properly overruled ADM's motions for a directed verdict and for a judgment notwithstanding the verdict, the district court was obligated to view the evidence in the light most favorable to U.S. Borax regardless of whether such evidence was contradicted. *Larsen v. United Fed. Sav. & Loan Ass'n,* 300 N.W.2d 281, 283 (Iowa 1981) (citing *Becker v. D & E Distrib. Co.,* 247 N.W.2d 727, 729–30 (Iowa 1976)). "[I]f reasonable minds could differ on the issue, it was properly submitted to the jury." *Id.* "Evidence is substantial or sufficient when a reasonable mind could accept it as adequate to reach the same findings." *Waukon Auto Supply v. Farmers & Merchants Sav. Bank,* 440 N.W.2d 844, 846 (Iowa 1989) (citation omitted). Evidence is not insubstantial merely because it could support contrary inferences. *Grinnell Mut. Reins. Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988) (citation omitted). We find substantial evidence in the record to support each of the specifications of negligence submitted to the jury.

Therefore, the district court did not err in denying ADM's motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial on the grounds asserted in the decision.

■ **II.** *Measure of Damages.* ADM next contends the district court erred in instructing the jury that the damages included the fair and reasonable market value of the Borax before it was damaged. ADM argues the court should have instructed the jury on replacement cost instead.

■ Jury instructions are designed to explain the applicable law to the jurors so the law may be applied to the facts proven at trial. *State v. Freeman,* 267 N.W.2d 69, 71 (Iowa 1978). Submission of issues that have no support in the evidence to the jury is error. *W.T. Rawleigh Medical Co. v. Bane,* 181 Iowa 734, 739, 165 N.W. 42, 43–44 (1917). Conversely, failure to submit issues which are supported by substantial evidence also is error. *See Borough v. Minneapolis & St. L.R. Co.,* 191 Iowa 1216, 1223, 184 N.W. 320, 323 (1921).

Instruction No. 18, which dealt with damages, stated, in relevant part:

> If you find plaintiff is entitled to recover damages, it is your duty to determine the amount. In doing so, you shall consider the following items:

> Fair and reasonable market value of the Borax–10 before damages sustained, if any, less any salvage value.

At trial, U.S. Borax presented evidence that its cost to replace the damaged Borax would be $80.50 per ton. Therefore, the cost to replace the damaged 597.63 tons of Borax was approximately $48,109. Adding an additional 3.5 percent for marketing expenses, about $49,793 plus freight would be the total cost to replace the damaged Borax. Less the $50,000 U.S. Borax received for salvage value, U.S. Borax would have netted about a $207 profit.

U.S. Borax also presented evidence that the market value of Borax was $192 per ton. The market value of 597.63 tons of Borax therefore would be $114,745. Less the $50,000 U.S. Borax received as salvage value, the amount of damages calculated with market value would be about $64,745. This is comparable to the $64,745.92 which the jury awarded in the special verdict for the loss of the Borax.

Clearly, there is a significant difference between the fair market value and the replacement cost of Borax. U.S. Borax contends there is adequate support in Iowa law to award fair market value. Specifically, U.S. Borax contends when property is totally destroyed, the measure of damages must be reasonable market value. U.S. Borax relies on *Long v. McAllister,* 319 N.W.2d 256 (Iowa 1982). *Long* dealt with property damage to a motor vehicle following an accident. *Id.* at 257. In this case, the supreme court held:

> When the motor vehicle is totally destroyed or the reasonable cost of repair exceeds the difference in reasonable market value before and after the injury, the measure of damages is the lost market value plus the reasonable value of the use of the vehicle for the time reasonably required to obtain a replacement.

*Id.* at 261.

We conclude the Borax was not totally destroyed insofar as the product clearly had significant salvage value, $50,000. Furthermore, *Long* involved an automobile. The difference between the replacement cost and the fair market value of an automobile is inapposite to the question of damages in this particular case.

■ Iowa courts have not before examined the matter of the measure of damages for a chemical product in which the replacement cost and the fair market value are so significantly disproportionate to one another. Therefore, we must look to the the general law of damages. *Dealers Hobby, Inc. v. Marie Ann Linn Realty Co.,* 255 N.W.2d 131, 134 (Iowa 1977). Specific rules relating to damages are subordinated to the general rule of compensation for loss. *Iowa Power & Light Co. v. Board of Water Works,* 281 N.W.2d 827, 832 (Iowa 1979).

■ "It is axiomatic that the principle underlying allowance of damages is that of compensation, the ultimate purpose being to place the injured party in as favorable a position as though no wrong had been committed." *Dealers Hobby,* 255 N.W.2d at 134 (citations omitted). However, no injured party should receive more than has been lost as a result of another's wrongdoing. *Iowa*

*Power,* 281 N.W.2d at 832 (citing *Dealers Hobby,* 255 N.W.2d at 143). In this particular case, both replacement cost and fair market value would, at a minimum, restore U.S. Borax back to its original position.

> When there is more than one method of estimating damages, that method which is most definite and certain should be adopted. No one method is exclusive where several exist, but that one should be chosen which best achieves the fundamental purpose of compensation to the injured person for his loss; and, if the facts show that either of two measures of damages will fully compensate plaintiff for his loss, the measure must be adopted which is less expensive to defendant.

25 C.J.S. *Damages* § 72.

We agree with the above reasoning. To award U.S. Borax fair market value under these circumstances clearly resulted in an unjust windfall to the plaintiff. *See also DeWaay v. Muhr,* 160 N.W.2d 454, 458 (Iowa 1968) (quoting 25 C.J.S. *Damages* § 74) (" 'a given formula is improvidently invoked if it defeats a commonsense solution' "). We conclude the district court erred in instructing the jury on fair market value and in failing to instruct the jury on replacement cost. We reverse on this issue and remand to the district court for a limited trial on the issue of damages for the damaged 597.63 tons of Borax. We direct the court to instruct the jury to consider replacement cost rather than fair and reasonable market value in determining the amount of damages to be awarded.

■ **III. *Evidence of Settlement Offer.*** ADM contends the district court erred in refusing to grant a mistrial following the admission of evidence that ADM's insurance adjuster had offered $110,000 to settle U.S. Borax's claim.

At trial, U.S. Borax presented John Mann, former counsel for U.S. Borax, who testified regarding his negotiations with John Fullenkamp, ADM's insurance agent. During direct examination, Mann testified as follows:

Q (Attorney for U.S. Borax): Did you have problems in your negotiations with Mr. Fullenkamp? A (Mann): Yes.

Q: Can you tell the jury what those problems were? A: Well, I had several telephone conversations with him, and we exchanged some things by mail or fax. I made it clear to him in the opening telephone conversation that there were a number of claims which U.S. Borax had for which it sought reimbursement: The value of the Borax itself that was damaged in the cars, any claims from General Electric for the damage to the cars themselves, our freight costs in getting the Borax from California to Burlington, and the rental costs which were accruing on the cars themselves, the money we would owe General Electric under the lease.

He said that he understood that, and he made an offer of $110,000, and I said—

Q (Attorney for ADM): Excuse me. I'm going to—May we approach the bench? The Court: You may.

At that point, ADM moved for a mistrial on the basis of Mann's testimony that Fullenkamp had offered $110,000. The court found the fact mitigation was in issue was no justification for offering the above testimony. However, the court found an admonition and an order to strike the above testimony adequately remedied any prejudicial effects of the testimony and refused to grant a mistrial.

■ The district court has considerable discretion in determining whether to grant a mistrial. *Yeager v. Durflinger*, 280 N.W.2d 1, 7 (Iowa 1979). Such discretion is a recognition that the district court is in a better position to appraise the situation in the context of the full trial. *Id.*

Initially, we address U.S. Borax's contention that the above statement was not necessarily inadmissible because ADM had placed mitigation of damages in issue. We find Mann's statement regarding the settlement offer to be a clear violation of Iowa Rule of Evidence 408, which states offers to compromise a controversy are inadmissible as an admission of liability.

■ If the court had rejected the motion to strike the evidence or refused to admonish the jury, there would have been a clear abuse of discretion. However, in this case, no further testimony was permitted following ADM's objection. After its refusal to grant a mistrial, the court granted ADM's motion to strike the testimony. The court advised the jury the statement regarding settlement negotiations was not a proper matter for the jury to consider and admonished them to disregard it. We do not find the failure to grant a mistrial on the basis of one inadmissible statement in a trial which consumed almost 600 pages of testimony constitutes an abuse of discretion. *See Yeager*, 280 N.W.2d at 7 (failure to grant mistrial on the basis of testimony regarding an offer to settle for $35,000 in trial which consumed 400 pages of testimony was not an abuse of discretion).

■ **IV.** *Professor Hartley's Testimony.* ADM argues the district court erred in permitting U.S. Borax's expert witness, Professor Hartley, to testify beyond the scope of his testimony in discovery proceedings.

■ In assessing a district court's ruling on the admissibility of expert witness testimony, we review for an abuse of discretion. *Loftsgard v. Dorrian*, 476 N.W.2d 730, 732 (Iowa App.1991). The testimony presented by an expert witness at trial is controlled by Iowa Rule of Civil Procedure 125(d). Rule 125(d) states, in pertinent part:

(d) **Expert Testimony at Trial.** To the extent that the facts known, or mental impressions and opinions held, by an expert have been developed in discovery proceedings under subdivisions (a)(1) or (2) of this rule, the expert's direct testimony at trial may not be inconsistent with or go beyond the fair scope of the expert's testimony in the discovery proceedings as set forth in the expert's deposition, answer to interrogatories, separate report, or supplement thereto. . . .

Iowa Rule of Civil Procedure 125(c) sets forth the continuing duty of a party to disclose the subject of an expert witness's testimony which has not been previously disclosed in response to an appropriate inquiry. The purpose of rules 125(c) and 125(d) is "to avoid surprise to litigants and to permit issues to become both defined and refined before trial." *Mercy Hosp. v. Hansen, Lind & Meyer*, 456 N.W.2d 666, 670 (Iowa 1990).

During his deposition, Professor Hartley testified as follows regarding his knowledge of industry standards in the area of excessive accumulation of grain dust:

Q (Attorney for ADM): I take it there were, then, no governmental standards or regulations or criteria as to how much grain dust was excessive or acceptable insofar as propensity to cause explosion. Is that correct? A (Professor Hartley): In the limited time I have had available, I have not tracked any down yet. I believe there were some standards to that effect. I believe NFPA standards on bulk handling of material there may be some. I haven't yet found it, though.

Q: All right now—. A: I haven't gone back to the federal government to ask for those reports and see what the actions were on those, but I think to answer your question, *I don't know of any adopted regulations or standards limiting the amount. There were plenty of proposals, a lot of information available about it.*

Q: Setting aside government, now, are there any, or were there any industry standards that were published which would set the acceptable or unacceptable level of grain dust regarding this propensity to explode. A: There may have been. In Exhibit No. 4, Deposition Exhibit No. 4, the SFPE Bulletin, the article on the research accomplished by the Fire and Explosion Research Council appointed in August 1978, by the National Grain and Feed Association refers to a number of separate publications in various areas of research.

(Emphasis added.)

During the close of the deposition, Professor Hartley indicated he intended to obtain additional materials regarding any such proposed standards.

Q (Attorney for ADM): You do have sort of a closing statement here. "Further review and study may indicate additional factors which caused the defendants' grain elevator explosion and are expected to reinforce those opinions as stated herein."

Do you, as you sit here today, contemplate doing any further review or study? A (Professor Hartley): I believe that will be more up to my client than to me. If my client authorizes it, I would like to do some more.

Q: All right, what would you like to do? A: I would like to contact the individual at Iowa State. *I would like to get the material that was prepared by the—well, that went out—prepared by the Grain and Feed Association,* I believe it was, on their research programs. There are a number research reports that I would get and see if those are applicable to these.

(Emphasis added.)

Then, at trial during direct examination, Professor Hartley testified as follows:

Q (Attorney for U.S. Borax): Let me ask you this question: In 1987, was there any standard being promulgated in the grain industry as to acceptable levels of grain dust before they became hazardous, i.e., explosive? A (Professor Hartley): There was a lot of discussion. There was—There were proposals made both within the industry and outside the industry in 1987. To the best of my knowledge those proposals had been—not been adopted, but there were proposals.

The proposals referred to both layered dust and dust in the atmosphere. Dust in the atmosphere was a much more easier problem to solve.

Q: Were there any standards being promulgated by members of the industry, if you will, prior to 1987? A: There were under discussion, and industry representatives were on record saying that certain levels of dust were to be considered as hazardous—were recognized as being hazardous, pardon me.

Q: What levels of dust were recognized as being hazardous at that time?

Q (Attorney for ADM): I'm going to object to the question because the witness has talked about industry standards, and he said there weren't any such standards. So I don't know how he could testify about nonexistent standards.

The court: Overruled. The witness may answer.

Following the district court's overruling of ADM's objection, Professor Hartley testified

regarding a collection of papers presented at a grain dust control seminar which was published in 1981 by the National Grain and Feed Association (NGFA).

The determination of whether the district court abused its discretion hinges upon whether ADM received sufficient notice from the discovery proceedings that U.S. Borax would seek to introduce into evidence standards of hazardous grain dust accumulation. In the deposition, Professor Hartley clearly stated that, although there had been no adopted standards, there were several standards which had been proposed. He further testified he intended to do additional research, including locating the NGFA study, if so authorized by his client.

Through Professor Hartley's testimony regarding the existence of the NGFA study, its proposed standards, and his intent to locate that study, ADM was provided with sufficient notice as to the content of Professor Hartley's testimony. We find there was no additional duty to supplement the discovery proceedings under Iowa Rule of Civil Procedure 125(c). Professor Hartley's testimony at trial did not exceed the fair scope of his testimony during the discovery proceedings. Therefore, we find the district court did not abuse its discretion in admitting Professor Hartley's testimony. We affirm on this issue.

For the reasons stated, we reverse and remand to the district court for a limited trial on the issue of damages. We direct the court to instruct the jury in accordance with this opinion. In all other respects, the judgment of the district court is affirmed.

The costs of this appeal are taxed one-half to U.S. Borax and one-half to ADM.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

McCARTNEY, Senior Judge, concurs.

OXBERGER, C.J., specially concurs.

OXBERGER, Chief Judge (specially concurring).

I specially concur. The majority utilizes replacement cost as the proper measure of damages. I agree with this reasoning only because the record does not indicate Borax had definite or contractual arrangements to sell the goods prior to the fire. If Borax had produced evidence of a prior contractual agreement or sale arrangement for the Borax, I believe the correct measure of damages would be the fair market value or the agreed upon sale price.